Good morning, members of the Court. My name is Michael Bianni. I represent Charles Mosley. The case presents three issues. I'd like to start with actually what is issue number two because of all of the recent case law, and that is the issue of the sufficiency of the evidence. In an effort to try to synthesize the case law, I think that the number one principle that dominates consideration of the question of whether there was sufficient evidence for the 944C conviction is that the mutual presence of guns and drugs is not enough. But in Rios, the main fact was there was no mutual presence of drugs and guns. There was no drugs. Well, there were a lot of facts in Rios that I thought that were important. But that's a particularly important fact. It's kind of a key fact. It's true. In Rios, the court … It's like ham and eggs. If you don't have ham, you can't make ham and eggs. You have to have eggs. The court certainly commented on that. But the court also certainly affirmed the principle that the presence of guns and drugs alone would not be sufficient, and that that can be found in Rios as well. Isn't this case closer to our decision in Krauss? No. Why not? It's not because I wrote it. I saw you smile. But, I mean, really, guns, drugs … I think this trauma means a brilliant decision. Stop. I am aware who wrote Rios. Yeah, I'm sure you are. All right. Now, beyond that, tell me why that case was factually distinguishable. Well, in Krauss, you had overwhelming circumstantial evidence, because the defendant in that case had essentially a discreet room in the house, in which, what, there were 115 individually packaged items of marijuana, about 1 1⁄2 to 2 1⁄2 pounds. You had, in the top drawer of the dresser in Krauss, you had a package of marijuana, 1 1⁄2 package of marijuana. You had the gun, you had an extra clip, and also in the dresser you had four other guns. There was other evidence. I think there was a bale of marijuana in the room. The room seemed dedicated to that sole purpose as a discreet location within the house. Our case, Mr. Mosley's case, is tremendously different, because the guns were remote from where the drugs were located, significantly remote. I think, of course, I had a chance to view the supplemental excerpt showing where the guns were in relation to the drugs. So it's a totally different situation. Well, I don't know that having the drugs and the guns in the same location is necessary. I mean, the question is, are they there in relation to the drug transaction? I'm sorry, I misunderstood you, sir. Are the guns being used in relation to the drugs? Yes. Okay, so let's say you have a stash house. No, I'm not saying that this is necessary. This is hypothetical. And let's say there are, you know, there's a front door and some windows, and with every door and window there is a shotgun or a rifle popped up against it. You would say, well, what looks like is a situation where you're doing drugs inside. You fear that you might be raided by the police or perhaps raided by another gang or another dealer. And so you don't locate the guns where the drugs are because you don't need them over there. Where you need them is where you are likely to face the enemy. And I'm not sure proximity is necessarily helpful. What I thought was about some of these guns, at least in this case, they were loaded. I don't remember whether they were chambered. There was at least one automatic, right? A semi-automatic? There were two chambered. One was not. And one was cocked and loaded, right? With the safety on. But it was cocked and loaded. Okay. All right. What does that mean? It was a revolver? Excuse me? What does it mean to be cocked and loaded with safety on? It means you have to... It was an automatic pistol. A semi-automatic pistol is what it was. So that's the same as chambered. When you chamber a round into a semi, you're not necessarily cocking back the trigger. There's a way to disengage the trigger without... You could, but you have to know how to do it. But it's possible. Normally, yeah, when you chamber it using this great mechanism in the magazine... You put on the slide that chambers a round into the... They put the round in the chamber. And at the same time, cocks back the hammer. So when the slide moves forward, the gun is in shooting position, unless you have a safety. And the safety can then lock the trigger and keep it from being pulled back. Then a gun might be ready to be fired is really the norm for keeping a gun. I don't think it's a fact that... And in this court's decisions, it hasn't been a... It may not be found in these parts, but in California, we use gun safes. I'm not saying... The ammo is kept separate. You never have the magazines and the ammo loaded with the gun. It is certainly not the safest way to keep a semi-automatic pistol, even if it's laying on the table next to the front door. For a man who lives by himself and has no visitors, what difference does it make where he keeps his gun? Well, it does make a difference in our case law. But it looks to me, from the evidence, that he's got guns stashed everywhere in what is... You may not agree that it's a stash house, but it sure looks like a sparsely furnished apartment that's full of drugs and guns and evidence of drug dealing. In my experience, we call that a stash house. But that aside, in order to win on your theory, we have to look at this evidence and say that no reasonable jury could have concluded from this evidence that these weapons were being used in furtherance of drug dealing. And I'm having a hard time, on this record, agreeing that you've got a good issue here. What is sparse here is the evidence, the positive evidence, that the government has that the guns had any bearing on those. The biggest connection between this case and Rios, let me ask you this. Was there any evidence that there was drug dealing there? No. So that's the one point of similarity, or the major point of similarity with Rios. It's huge. That there was drugs in this house and there were loaded guns, unlike unloaded guns in Rios, and there were guns that were out in a place that would be used rather than taken away. But the one thing that is similar is that there was no direct evidence that anybody actually came to that house to deal drugs. Is that right? None whatsoever. And that's of critical importance. Again, the presumption here, I think that the principle that bleeds through is the presumption is that the guns weren't for illegal purposes. In other words, guns have 40 purposes. They have self-defense purposes. I mean, the question might be raised. What if the self-defense was to defend from somebody taking a stash of drugs? Is that in furtherance of the possession, in furtherance of the drug crime? It probably is. It would, but the record is absolutely barren of any evidence of any. . . There was talk about rivals and robbers and this and that in the expert testimony, but there was no positive evidence that there was a rival, no positive evidence there was a robber. But he had lots of drugs in the house, again, unlike Rios, and he was trying to protect the house, including what was in it, presumably. Maybe. Including the drugs. Maybe. It wouldn't have been okay if somebody came in to steal the drugs. He would have used the guns. If somebody came in to steal his stereo, he would have used the guns. There's no evidence to build the platform that that's what his intent in having the guns was. It's all assumption. Semi-automatic handguns are not used for hunting in Alaska, not commonly. I mean, people don't take them to go quail shooting or . . . If you go fishing on the Russian River, some people might pack a pistol that could be big enough to stop a bear if it's a semi-auto. But your point is right. That's not the point I'm trying to make, sir. When I talk about sporting . . . They're anti-personnel weapons. I'm sorry, what? Handguns. Yeah. And particularly semi-automatics are . . . I mean, you might shoot a rattlesnake with a revolver, but they're anti-personnel weapons. That's what they're for. They're for shooting people. Target practice? Any number of reasons. Especially if it's shaped like people. You know, targets . . . Any of these old concentric circles . . . He was referring to a different kind of target, Counselor. I realize I'm over time, but there were a few things I wanted to add to my brief on the suppression issue, if you don't mind. Let me ask you my question on suppression. Thank you. It seems . . . Let's assume, for purposes of this discussion, that there was, in fact, a falsity in the document, and that it was . . . The question is whether it was negligent or reckless. And my question is, what do you look to to answer that question? Do we look to the officer's own recklessness, or do we look to the recklessness . . . Or can we consider, in some respect, that the department was reckless and not . . . Here we have a situation where the package for the test said, don't do it this way. And they did it that way. There was a hearing in which it was demonstrated that the officer quite possibly had no reason to know that, and that he wasn't being reckless. He was doing what he was told. Is that the dispositive question or not? That's what I couldn't tell. Do you understand my question? I don't think the officer is excused because the department as a whole is reckless. Well, that's what I'm trying to . . . I couldn't find any case law on that question. Do you know of any? The issue of what training was . . . Ordinary. My focus is on the individual officer. There's no case that I know of where the entire department was found reckless, and that was attributed to the officer. I think that the officer is a professional and has an inherent duty to know what they're talking about if they're going to go to a search warrant judge. And if he had no training, he should have at least acknowledged that as a statement to the search warrant judge, especially when he fudged on the result and put in meth instead of amphetamine compound, which is what the test arguably could have supported. Do you have a couple of points you want to go ahead? Well, I guess the point I want to make, Judge, is that we had some testimony. The question might be the materiality of the difference between amphetamines and methamphetamines, and I put some thought into it. And amphetamine is a legitimate prescription-type drug. In other words, they don't call it amphetamines, but there's a whole block of items, and I think it's hard to testify to that fairly effectively, that it would be benign. It wouldn't be evidence of criminality. And that, I think, makes the difference between meth and amphetamine material. And I just hesitate to say it on the record, but I Googled the matter, putting in the words amphetamine in prescription, and you do get a listing of items that along the lines of, say, OxyContin or other drugs that are out there that are sold in the streets illegally but also are used legally. The difference here, of course, between OxyContin and amphetamine is that amphetamines have disappeared as a street drug for sale. So what we have left is, if the officer had been honest in the search warrant proceedings. I'm sure the NSA now knows all about this. I hope so. Thank you, sir. That's what I wanted to ask. We'll hear from the government. May it please the Court, I still represent the government. I'll begin as well with the second issue that was briefed in this case, which is the 924C question, whether the guns were used in furtherance of drug trafficking. Rios is the Court's most recent pronouncement on this, and I think that Rios adopted the analysis in Krauss that the factors the Court looks to to decide whether a sufficient nexus has been shown between the guns and the drugs is proximity, accessibility of the weapons, and the strategic location of the weapons. So what was the strategic location here? The strategic location here is that it was right at the front door. It was at the perimeter of the front door. There was one at the front door, right? There was one. Was that the one in the satchel backpack? No. There were three guns. They were all at the entrance to the apartment. One was sitting on a counter or a bench of some sort built into the wall right by the front door entrance. The other two were in a backpack that was contaminated with cocaine in a closet right there at the front entrance, the front entryway. I'd suggest that with respect to the question of proximity to the drugs. Those are quite different. If you have the gun in an alcove or something near the door, then if there's a knock on the door, you know, you can grab it and sort of look for the peephole or crack open the door and see who it is while, you know, while having your hand on the gun. You know, in a closet in a in a in a satchel strikes me as not nearly as helpful to you. Those those guns, I believe, are connected with the drug trafficking in the sense of their portability and the fact that they were. You know, I don't know. I don't think it matters. Exactly. I would suggest. So the gun in the satchel, the inference we'd have to draw there is that that was a satchel that was used for transporting drugs and that he kept a gun in there to to always have a gun with him when he's transporting drugs in a satchel. Two loaded guns, actually. OK. And I think that that is a fair inference that the jury was permitted to draw. And it doesn't matter. But it doesn't matter. Exactly. I would refer the court to tab P, which is a series of photographs of the of the apartment with respect to the proximity of guns to the drugs. The first photograph at page one of three is at the front door directly in front of the front door is an open area that in turn opens into the kitchen. I tried pacing it off in my office based on the photographs. It looks like it's maybe 10 to 12 steps away. So he is a lot fewer. Tab P pages one of three to one of five. The first few is looking in the front door. I see a shoe. Exactly. And I see a broom at the end. If you if you turn the page over there. And I see a vacuum cleaner. Yes. And turn the page. I mean, it's actually a very nice picture. It could be still life. Directly. What did you think it was? I paced it off. And I guess maybe 10 to 12 steps from from where from the front door. I see. So this is the same room in the same vacuum cleaner. That's right. And off to the left is the open kitchen with all the drugs and seven thousand dollars in cash. Literally steps. And where were the guns? I see. And this makes a corner. That's right. And the loaded bread is on a shelf just inside the front door. It can be seen on page two or two in the photographs. A low shelf built into the wall. We almost flipped these photographs and get a movie picture. I believe that's actually how the officers take them. I don't see a gun. Is it on page two or two? Do I have. Oh, yeah. That's it. Yeah. OK. And two or two are facing the door with a knob on the left is the front door. And that's from the inside. And that's the same black shoe. Right. Got it. OK. And is that the semi-automatic that was chambered in? Yes. OK. Furthermore, in the kitchen cabinet, right next to the plastic container containing the drugs, was ammunition that fit that gun. Further cementing the link, I believe, between the drugs and the gun. So it doesn't matter at all that there was no evidence of actual drug trafficking in this area? The government's theory of this case is that this was actually a stash house. This was not a, at least there was no evidence on the record, that this was a place from where the defendant was dealing drugs. Instead, this is where he was cooking his drugs, and this is where he kept his money and his cash. The theory is necessarily, and I suppose it makes sense, that possessing a gun to defend the drugs from theft, essentially, because that seems to be, or I guess from police intrusion, perhaps, but not is a use, is a possession in furtherance of the drug crime. Oh, exactly. I think that this Court's decisions explicitly recognize that that's one of the major reasons that gun dealers carry drugs, is to protect their cash and their drugs from anybody, from rivals or thieves or perhaps from the police. Does that lead to the conclusion that pretty much if there's drugs in an apartment and a gun in the apartment in a position to be used, then that's sufficient? I don't know why it matters how close to each other they are exactly, if that's the theory. I mean, if the person has a gun that they would use to defend from somebody coming in to take their drugs, why does it matter if the gun is near the drugs or far from the gun? I don't think that's necessarily going to be enough, particularly in a state like Alaska where hunting and drug owning is pretty ubiquitous. It's fairly uncommon, actually, I think, to find a home that doesn't have a gun of some sort in it. If it's clearly a hunting rifle in the closet, no matter how accessible it is, I don't think the government would have met its burden in that situation. If it's a gun collection that appears to have been of antiques, that's not going to necessarily... I think it's a loaded gun after all. But a loaded pistol at the door. About the methamphetamine, amphetamine, et cetera, problem, and particularly my question, which is how would you determine... Why is the focus on recklessness on this officer's knowledge, or why does it seem to be absolving, because this was the tone of the evidence, that in general this is how the police department treated these tests. Why is that absolving in terms of recklessness if they were doing it recklessly, if they were not paying attention to the directions that said that you shouldn't do it this way? Well, because the question in a Franks hearing is whether the police officer... Well, that's what I'm asking you. Why is that the question in a Franks hearing? Or what case law is there that says the question in the Franks hearing is what the individual officer thought, and so if he was told something wrong by the police department, then it's not reckless. That seems strange to me. Because the question is whether or not the facts in the affidavit, as the police officer represents them to the issuing officer... Are recklessly incorrect. And if any reasonable person would have followed the directions on the package, but he was told by the Anchorage Police Department not to do it, that he didn't need to do that, that may absolve him, but why does it absolve law enforcement whom he was representing in getting the warrant? That may be a problem, though in this case, of course, he was not told not to do it, and the district court directly addresses the question... Well, that's the point of all the evidence showing that we don't do it that way, and we just haven't been doing that, as seeming to absolve him from having followed the directions in the package, and he didn't have the package. How was he to know that? Well, I believe the point of the evidence was to demonstrate that the procedure that the officer actually followed was, in fact, the procedure that experienced, trained officers in the same department followed. Okay, but having to go to the question of why that makes it okay for them to not follow the directions would say that this is not accurate information, as I understand it. Well, it is accurate information. The positive test does show a positive result for amphetamine slash methamphetamine. Actually, we don't really know why this test came up a false positive. We don't know what was in that beaker top to trigger a false positive, something. That issue would be a problem with the test itself, as opposed to the procedures followed by the officers. In this case, the defendant is arguing that the officers should have put in the warrant amphetamine slash methamphetamine, and I present to you that that would have made absolutely no difference to the probable cause shown. He said it was methamphetamine because, in his experience, methamphetamine was a drug that you encounter on the street and it looked like methamphetamine to him. Marijuana sometimes is laced with methamphetamine, so it made sense to him that it would be in a grinder top with marijuana. And my time is up. If there are no other questions. Thank you. Thank you. One minute. Thank you. Just to correct the last point, we are arguing that the police department was reckless for not doing the second test, not following the instructions that the manufacturer essentially not only recommended, but required, you're going to report a positive test for methamphetamines. So that in and of itself is reckless. As for the deliberate aspect of it, the intentional falsity, that was when the officer fudged the result by limiting his report to the magistrate that it was meth when, in fact, he had to know otherwise. The officer testified that the kitchen was 15 to 20 feet, in his estimate, from the... We saw the picture. Thank you. Thank you for a good argument on both sides. Cases have been submitted. We'll take a 10-minute discussion break.
judges: Kozinski, Berzon, Tallman